UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                      :

SHERINA THOMAS and DIANDRA MENDEZ, :
                                      :

                       Plaintiffs, :          13-CV-8512 (JPO)
                                      :

               -v-                    :          OPINION AND ORDER
                                      :

EONY LLC and DAVID SHAVOLIAN, :
                                      :

                       Defendants. :
-----------------------------------------------------------X

J. PAUL OETKEN, District Judge:

        Plaintiffs Sherina Thomas and Diandra Mendez (together, "Plaintiffs") bring this action

asserting violations of overtime requirements and other wage-related provisions of the federal

Fair Labor Standards Act ("FLSA"), the New York Labor Law ("NYLL"), and the New York

City Administrative Code.  Plaintiffs also bring claims for sexual harassment, disability

discrimination, and intentional infliction of emotional dismiss under the New York City

Administrative Code and New York tort law.  The suit names Plaintiffs' former employer,

EONY LLC ("EONY"), and David Shavolian, the principal of EONY (together with EONY,

"Defendants").  Presently before the Court is Plaintiffs' motion, styled as a "motion to exercise

supplemental jurisdiction," concerning whether the exercise of supplemental jurisdiction is

proper over Plaintiffs' claims under New York state law and the New York City Administrative

Code.  For the reasons that follow, the Court concludes that the exercise of supplemental

jurisdiction is improper with regard to the nonfederal sexual harassment, disability

discrimination, and tort claims.  In the alternative, the Court declines to exercise supplemental

jurisdiction over those claims.  Accordingly, those claims are dismissed without prejudice.

I.     **Background**

  A.     **Facts**[1]

    1.     **Wage and Hour Allegations**[2]

Thomas began working at EONY on June 11, 2012, for 40 hours per week.  (Dkt. No. 34 ("FAC") ¶ 130.)  Beginning October 1, 2012, Thomas was forced to work through most or all of her lunch break, such that she worked at least one hour—and sometimes more—over 40 per week.  (*Id.* ¶¶ 131-33.)  Then, in late December or early January 2013, Thomas began working "even more overtime hours" because of further shortened lunch breaks to "between five and 10 minutes," and during at least one week in April of that year Thomas was "not permitted to take a lunch break."  (*Id.* ¶¶ 135-36.)  According to Thomas, she was "misclassified" as an independent contractor and was not paid overtime as a result.  (*Id.* ¶ 134.)  Instead, she was paid only her biweekly salary of $1,035.  (*Id.* ¶ 137.)

Mendez began working full-time at EONY on January 8, 2013.  (*Id.* ¶ 140.)  She worked from 9:00 a.m. until 5:30 p.m., Monday through Friday, without a break for lunch.  (*Id.*)  Mendez provides examples of weeks in which this arrangement resulted in her working 42.5 hours per week, for which she was not fully compensated.  (*Id.* ¶¶ 145-46.)  Like Thomas, Mendez asserts that she was "misclassified" as an independent contractor and was not paid overtime as a result.  (*Id.* ¶ 142.)  Mendez says she was also paid only a biweekly salary of $1,035.  (*Id.*)

_____

[1] The following facts are drawn from the First Amended Complaint (Dkt. No. 34), whose allegations are taken as true at this stage.

[2] The complaint sets off the wage and hour allegations from the other allegations in separate sections, each with its own heading.

According to the complaint, Thomas and Mendez were "directly and closely supervised" by Shavolian and "did not exercise any discretion or independent judgment while engaged in their princip[al] duties." (*Id.* ¶ 150.) Plaintiffs collected rent payments from tenants, did clerical work, answered telephones, and relayed tenant complaints to Shavolian. (*Id.* ¶¶ 151-53.) Defendants "had no method by which Plaintiffs could accurately record . . . their hours worked." (*Id.* ¶ 156.)

### 2.        Sexual Harassment, Disability Discrimination, and Tort Allegations

Thomas alleges that she first met Shavolian at an unspecified date when she was answering an advertisement for child models on behalf of her children. (*Id.* ¶ 21.) At this meeting, Shavolian asked Thomas to "remove her blazer so he could see the shape of her body," despite Thomas's statement of disinterest in modeling herself. (*Id.* ¶¶ 23-24.) He then forced Thomas to show him her breasts and "then assessed [her] breasts by . . . squeezing, fondling and jiggling [them]," ultimately telling Thomas that her breasts were not fit for modeling but that he could help her get breast surgery. (*Id.* ¶¶ 26-27.) Shavolian then told Thomas that he would call her "if anything comes up in terms of available work." (*Id.* ¶ 28.)

In May 2012, Shavolian called Thomas about a receptionist position at EONY. At an interview the same month, Shavolian asked Thomas questions about her pubic hair maintenance. (*Id.* ¶¶ 29-30.) Thomas got the job and began working at EONY as a receptionist on May 21, 2012. (*Id.* ¶¶ 31-32.)

Once on the job, Thomas was subjected to repeated instances of sexual harassment by Shavolian, which she claims created a hostile work environment. (*Id.* ¶ 34.) Among these were instances where Thomas was forced to "stand right next to [Shavolian] while he urinated" and to "watch [Shavolian] undress." (*Id.* ¶¶ 35-36.) Shavolian also telephoned Thomas to "inform her

that his underwear was too tight and that they [sic] were 'squeezing his balls.'"  (*Id.* ¶ 37

(internal brackets and emphasis omitted).)  The complaint is rife with other allegations of sexual

misconduct by Shavolian, including his requests that Thomas look at his anal rash, that she put

lotion on his penis, and that she provide him with "pictures of female genitalia."  (*Id.* ¶¶ 38-39,

41.)  The complaint further alleges that Shavolian offered to pay one of Thomas's bills in

exchange for oral sex, and that Shavolian offered her an extra week of vacation and an extra

week of pay if she "succumbed to [Shavolian's] sexual advances."  (*Id.* ¶¶ 42, 45-46.)  Thomas

asserts that she quit on May 1, 2013, because she "could no longer endure the harassment."  (*Id.*

¶¶ 49-50.)

As for Mendez, she interviewed with Shavolian for a receptionist position on September

19, 2012, after initially responding to an interview with a different company.  (*Id.* ¶¶ 51-53.)

During the interview, Shavolian asked Mendez if she was interested in modeling, but Mendez

demurred.  (*Id.* ¶¶ 54-60.)  Shavolian pursued this line of questioning.  Ultimately, at Shavolian's

request, Mendez lifted her shirt to show Shavolian her stomach as part of an effort to see if

Shavolian could "help her find work as a model."  (*Id.* ¶¶ 61-62.)  Shavolian then fondled

Mendez's breasts.  (*Id.* ¶ 63.)  Shavolian did so again toward the end of the interview, and then

asked Mendez to remove her bra, which she did.  (*Id.* ¶¶ 64-66.)  Shavolian offered Mendez the

receptionist job, and she accepted.  (*Id.* ¶ 67.)  The two proceeded to another floor, where

Shavolian once again persuaded Mendez to remove her shirt and bra, and Shavolian showed

Mendez certain exercises that he said would be beneficial for her.  (*Id.* ¶¶ 68-74.)  Shavolian

made comments about Mendez's breasts and also asked about her pubic hair maintenance.  (*Id.*

¶¶ 75-76.)  He asked Mendez to take her pants off; she refused.  (*Id.* ¶¶ 77-82.)  Shavolian

exposed his "pubic area" to Mendez, and then ended the interview.  (*Id.* ¶¶ 83-84.)

Mendez began working at EONY, and for the first three months, Shavolian left Mendez "mostly . . . unmolested." (*Id.* ¶¶ 87.)  After that period, however, Shavolian began to mock Mendez's figure.  (*Id.* ¶¶ 88-91.)  He also asked to see Mendez's "ass" on several occasions between February and May 2013.  (*Id.* ¶¶ 92-93.)  In an incident in July 2013, Shavolian lowered his pants in Mendez's presence such that his "penis was sticking out from under the bottom of his underwear."  (*Id.* ¶¶ 94-95 (emphasis omitted).)  Shavolian asked Mendez if his underwear was too small, complained of genital irritation, and asked Mendez to help him apply lotion to his penis.  (*Id.* ¶¶ 97-103.)  Mendez refused, but ultimately agreed to hold Shavolian's underwear while he applied lotion in order to "avoid jeopardizing her job."  (*Id.* ¶¶ 103-04.)  Shavolian proceeded to "slap[] one of [Mendez's] hands with his penis."  (*Id.* ¶ 105 (emphasis omitted).)  Shavolian also subjected Mendez to other instances of sexual harassment, including commenting on and throwing objects at Mendez's breasts.  (*Id.* ¶¶ 107-111.)  On one occasion, Mendez asserts that Shavolian purchased Mendez a bra, which he successfully encouraged her to try on in his presence.  (*Id.* ¶¶ 112-14.)

The complaint also asserts that Defendants subjected Mendez to disability discrimination. Mendez began "bleeding from her ovaries" in July 2013; she ultimately went to the hospital on July 31, 2013.  (*Id.* ¶¶ 118-19.)  Mendez told Defendants she would be unable to work because she needed medical treatment.  (*Id.* ¶ 120.)  The complaint asserts that Mendez "had taken $200 [that Shavolian] . . . owed her as wages."  (*Id.* ¶ 121.)  Shavolian proceeded to call the police and asked that Mendez be arrested for stealing.  Mendez recuperated "enough to return to work" by August 5, 2013.  When she arrived at work the following day, she was arrested by a police detective on an allegation of stealing $10,000 from Defendants.  (*Id.* ¶¶ 122-23.)  Mendez "admitted to taking the $200 that Defendants owed her and pled guilty to theft."  (*Id.* ¶ 124.)  The

complaint then asserts that "Defendants would not have harassed [Mendez] but for her disability

. . . or perceived disability," and that Defendants failed to "engage in the interactive process"

with Mendez, "retaliated against [Mendez] for having requested a reasonable accommodation,"

and also "retaliated against [Mendez] for exercising her protected rights" by terminating her.  (*Id.*

¶¶ 125-29.)

      **B.**    **Procedural History**

      Plaintiff Sherina Thomas filed this action against Defendants on November 27, 2013,

asserting wage and hour claims under federal and state law, as well as discrimination and tort

claims under New York state and New York City law.  (Dkt. No. 1.)  On March 13 and 14, 2014,

Defendants moved to dismiss or stay the action on the ground of abstention due to a related

action previously filed in state court.  (Dkt. Nos. 8, 12.)  On May 29, 2014, Thomas moved to

amend the complaint to add Diandra Mendez as a party.  (Dkt. No. 18.)  On October 24, 2014,

the Court granted the motion to amend the complaint and reserved decision on the motion to

dismiss pending briefing on the status of the state court action.  (Dkt. No. 29.)  In the same order,

the Court directed that Thomas "respond to Defendants' argument that the Court should decline

to exercise supplemental jurisdiction over the state law claims."  (*Id.* at 6.)

      On October 31, 2014, Plaintiffs filed a First Amended Complaint including both

Thomas's and Mendez's claims.  (FAC.)  The complaint contains four wage-related claims under

the FLSA, the NYLL, and the New York City Administrative code; five discrimination-related

claims under the New York City Human Rights Law ("NYCHRL"), section 8-107 of the New

York City Administrative Code; and one claim for intentional infliction of emotional distress

under New York tort law.  (*Id.* at 20-25.)  Thomas subsequently filed a letter stating that she

would dismiss the pending state court action against Defendants.  (Dkt. No. 38.)  As a result, the

Court denied the motions to dismiss as moot.  (Dkt. No. 41.)  Defendants then answered the complaint.  (Dkt. Nos. 50-51, 53.)

On February 9, 2015, the Court again ordered the parties to file briefing on supplemental jurisdiction.  (Dkt. No. 54.)  No briefing had been filed on the issue, despite the Court's direction to do so in the order filed October 24, 2014.  Plaintiffs have since filed their briefing, styled as a "motion to exercise supplemental jurisdiction."  (Dkt. No. 55.)  Defendants have responded and do not oppose the exercise of supplemental jurisdiction.  (Dkt. Nos. 59-60.)

## II.    Discussion

"Federal courts are courts of limited jurisdiction whose power is limited strictly by Article III of the Constitution and congressional statute."  *United Food & Commercial Workers Union v. Centermark Props. Meriden Square, Inc.*, 30 F.3d 298, 303 (2d Cir. 1994). Consequently, the "failure of subject matter jurisdiction is not waivable and may be raised at any time by a party or by the court *sua sponte*."  *Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 700 (2d Cir. 2000); *see also Mitchell v. Maurer*, 293 U.S. 237, 244 (1934) ("[The] lack of federal jurisdiction cannot be waived or be overcome by an agreement of the parties.").  "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3).

In a civil action in which it has original jurisdiction, a district court may exercise supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of

the United States Constitution."  28 U.S.C. § 1367(a).[3]  To constitute the same Article III case or

controversy, "the federal claim and state claim must stem from the same 'common nucleus of

operative fact'; in other words, they must be such that the plaintiff 'would ordinarily be expected

to try them all in one judicial proceeding.'"  *Montefiore Med. Ctr. v. Teamsters Local 272*, 642

F.3d 321, 332 (2d Cir. 2011) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)).

"To make this determination, courts 'have traditionally asked whether the facts underlying the

federal and state claims substantially overlapped or the federal claim necessarily brought the

facts underlying the state claim before the court.'"  *LaChapelle v. Torres*, 37 F. Supp. 3d 672,

680 (S.D.N.Y. 2014) (quoting *Achtman v. Kirby, McInerney & Squire LLP*, 464 F.3d 328, 335

(2d Cir. 2006)) (alterations and some internal quotation marks omitted).  "[S]upplemental

jurisdiction should not be exercised 'when the federal and state claims rest on essentially

unrelated facts.'"  *Chaluisan v. Simsmetal E. LLC*, 698 F. Supp. 2d 397, 401 (S.D.N.Y. 2010)

(quoting *Lyndonville Sav. Bank*, 211 F.3d at 704) (internal alteration omitted).  "[T]he Court

must dismiss all claims that do not share a common nucleus of operative fact with Plaintiffs'

federal claims."  *LaChapelle*, 37 F. Supp. 3d at 682.

### A.  Supplemental Jurisdiction: Nonfederal Wage and Hour Claims

Little analysis is required for the Court to determine that the wage and hour claims

brought under the NYLL and the New York City Administrative Code share a common nucleus

of operative fact with the federal FLSA claim, over which the Court has original jurisdiction.

*See Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 244 (2d Cir. 2011) ("Because

---

[3] Plaintiffs have advanced only § 1367 as a basis for jurisdiction over the state law claims.  (*See* FAC ¶¶ 1-2.)  Furthermore, a review of the complaint indicates that there is a lack of complete diversity between Plaintiffs and Defendants.  (*See id.* ¶¶ 5-9.)

FLSA and NYLL claims usually revolve around the same set of facts, plaintiffs frequently bring both types of claims together in a single action . . . .").  The resolution of all of the wage and hour claims will involve the same facts and evidence—principally documentary and testimonial evidence regarding Plaintiffs' employment by Defendants and the hours that Plaintiffs worked.  Accordingly, the Court concludes that the exercise of supplemental jurisdiction over Plaintiffs' nonfederal wage and hour claims is proper.

> **B.     Supplemental Jurisdiction: Sexual Harassment, Disability Discrimination, and Tort Claims**

As noted above, in determining whether federal and nonfederal claims share a common nucleus of operative fact, "the court should look to whether the evidence likely to be used in the specific case in addressing the federal claim is likely to substantially overlap [with] that used to address the state-law claims."  *BLT Rest. Grp. LLC v. Tourondel*, 855 F. Supp. 2d 4, 11 (S.D.N.Y. 2012).  District courts in this circuit have held that the fact of an employment relationship "does not establish a 'common nucleus of operative fact' where it is the sole fact" that connects federal and nonfederal claims.  *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 468 (S.D.N.Y. 2008) (citing cases); *see also, e.g.*, *Shearon v. Comfort Tech Mech. Co.*, No. 12 Civ. 96 (WFK), 2014 WL 1330751, at *4 (E.D.N.Y. Mar. 31, 2014) (stating that supplemental jurisdiction may be proper where "the employment relationship frames an overlapping or closely tied set of events," but concluding that "those factual circumstances [did] not exist" in the case in question).

Plaintiffs contend that the non-wage claims will "necessarily require presentation of many of the same facts (job duties, managerial responsibilities, and terms of employment) and testimony from the same witnesses (prior managers and co-workers)."  (Dkt. No. 56 ("Pl. Br.") at 15.)  The Court disagrees.  The evidence supporting the overtime claims will involve testimony

9

as to the number of hours Plaintiffs worked, and evidence as to whether Plaintiffs were "employees" of Defendants for purposes of the wage and hour laws.  Determining the employment relationship for purposes of the wage and hour claims will not require a broad inquiry into Plaintiffs' "job duties [and] managerial responsibilities," as plaintiffs contend. Rather, the relevant analysis asks "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Irizarry v. Catsimatidis*, 722 F.3d 99, 104-05 (2d Cir. 2013) (internal quotation marks omitted), *cert. denied*, 134 S. Ct. 1516 (2014).[4]  Accordingly, the wage and hour claims will require straightforward discovery and, in due course, would result in a straightforward trial as to this narrow set of issues.

In contrast, the sexual harassment, disability discrimination, and tort claims involve significantly different sets of facts from the wage and hour claims.  First, the NYCHRL sexual harassment claim requires Plaintiffs to show that they have "been treated less well than other employees because of [their] gender," *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 671

---

[4] In some other cases in which courts have exercised supplemental jurisdiction, the defendants have raised as a defense an exemption from the wage and hour laws that requires "a fact intensive inquiry concerning [the plaintiff's] duties and compensation." *Chaluisan*, 698 F. Supp. 2d at 401.  While it is questionable whether such a defense would change the result here, the Court does not reach the question because Defendants have not asserted an exemption defense in their answers.  (*See* Dkt. Nos. 51, 53.)  "[E]xemptions under the FLSA are an affirmative defense and therefore must be pleaded in the answer," *Schwind v. EW & Assocs., Inc.*, 357 F. Supp. 2d 691, 697 (S.D.N.Y. 2005), and "[t]he general rule in federal courts is that a failure to plead an affirmative defense in a responsive pleading results in a waiver," *Ebert v. Holiday Inn*, No. 11 Civ. 4102 (ER), 2014 WL 349640, at *9 (S.D.N.Y. Jan. 31, 2014) (citing *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1580 (2d Cir. 1994)).

(S.D.N.Y. 2012) (internal quotation marks omitted).  Other than the most basic background facts of the employment relationship, the Court can detect little in the potential evidentiary support for Plaintiffs' sexual harassment claims that would overlap with the evidence of the alleged wage and hour violations.

Plaintiffs contend that Shavolian "used Plaintiffs' job duties"—including allegedly "taking [Plaintiffs] to vacant offices"—"as a means to sexually harass them."  (Pl. Br. at 15.) But this amounts to no greater connection than the employment relationship itself, which is insufficient standing alone.[5]  *See Torres*, 628 F. Supp. 2d at 468-69.  Plaintiffs' counsel has also filed a declaration in which he proposes an additional factual allegation: that Mendez "was routinely forced to harangue Defendant Shavolian for . . . $235 in cash he owed her as wages but did not include in her paycheck and . . . Plaintiff Mendez regularly resorted to begging him for it."  (Dkt. No. 56, Ex. 1 ¶ 5.)  This proposed addition would not change the result here.  The new allegation can scarcely be considered relevant to the claim that Defendants did not pay Plaintiffs for specific overtime hours worked.  The Court concludes that Plaintiffs' allegations of a few instances of sexual harassment that are loosely connected with wages are insufficient to form a common nucleus of operative fact underlying both the wage and hour claims and the sexual harassment claim.

Second, Mendez's disability discrimination claims also have insufficient relation to the wage and hour claims.  The complaint is not a model of clarity, but it appears that Mendez is

---

[5] Also unconvincing is Plaintiffs' assertion that the proof of Shavolian's degree of control over Plaintiffs will underpin the wage and hour claims as well as the sexual harassment claim.  If the potential for some slight factual overlap were sufficient to render the exercise of supplemental jurisdiction proper, this would essentially scuttle the rule followed by district courts in this circuit that the "bare link" of the employment relationship alone cannot provide the necessary common nucleus of operative fact.  *See Shearon*, 2014 WL 1330751, at *3.

asserting that Defendants did not give her an accommodation when she was hospitalized for a medical condition.  The fact that, around the same time, Mendez admitted to having taken $200 from Defendants—which she says constituted unpaid wages that she was owed by Defendants— does not cause the disability discrimination claim to have a common nucleus of operative fact with the wage and hour claims.  Rather, this claim will involve "different rights, different interests, and different underlying facts" from the wage and hour claims.  *Hernandez v. Mauzone Home Kosher Prods. of Queens, Inc.*, No. 12 Civ. 2327 (SJ) (JMA), 2013 WL 5460196, at *6 (E.D.N.Y. Sept. 30, 2013) (internal quotation marks omitted).

Last, Plaintiffs' tort claim of intentional infliction of emotional distress does not share a factual basis with the wage and hour claims.  To state a claim for intentional infliction of emotional distress under New York law, a plaintiff must allege "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress."  *Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001) (internal quotation marks omitted).  "New York sets a high threshold for conduct that is 'extreme and outrageous' enough to constitute intentional infliction of emotional distress."  *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996).  The evidence of Plaintiffs' hours worked and their status as employees will have no material overlap with any of the conduct set out in the complaint that could be categorized as "extreme and outrageous."

Furthermore, the wage and hour claims may not even be contested by Defendants. Defendants call the wage and hour claims "trumped up overtime pay claims" that were "pleaded for the sole purpose of gaining federal subject matter jurisdiction and which Defendants are willing to settle by paying the full amount claimed."  (Dkt. No. 10 at 3; *see also id.* at 7-8 (same);

Dkt. No. 32, at 2.)  If Defendants concede liability for the wage and hour claims, extremely limited litigation and judicial resources will be required to resolve these claims.  The sexual harassment, disability discrimination, and tort claims, in contrast, are strongly contested by Defendants.

In sum, the Court concludes that the facts underlying the wage and hour claims are essentially unrelated—except for the employment relationship—to the facts underlying the remaining claims.  Thus, the federal FLSA claim will not "necessarily br[ing] the facts underlying the [nonfederal] claim[s] before the court," *Achtman*, 464 F.3d at 335, nor are the events essential to the federal claims "closely tied" to those underlying the nonfederal claims, *Shearon*, 2014 WL 1330751, at *4.  Without more, these sets of claims would not "ordinarily be expected to [be tried] in one judicial proceeding."  *See Gibbs*, 383 U.S. at 725.  The Court concludes that subject matter jurisdiction is lacking, and accordingly, the nonfederal sexual harassment, disability discrimination, and tort claims are dismissed without prejudice.

### C. Discretionary Declination to Exercise Supplemental Jurisdiction: Sexual Harassment, Disability Discrimination, and Tort Claims

A district court may also decline to exercise supplemental jurisdiction where:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  Courts invoking the exceptions to supplemental jurisdiction must "weigh and balance several factors, including considerations of judicial economy, convenience, and fairness to litigants."  *Ametex Fabrics, Inc. v. Just In Materials, Inc.*, 140 F.3d 101, 105 (2d Cir. 1998) (internal quotation marks omitted).

For reasons similar to those set out in the preceding section, the Court, in the alternative, declines to exercise supplemental jurisdiction over the sexual harassment, disability discrimination, and tort claims because they "substantially predominate" over the wage and hour claims.  28 U.S.C. § 1367(c)(2).  Nonfederal claims may "substantially predominate" in terms "of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought." *Gibbs*, 383 U.S. at 726.  "A court will consider whether the state law claims are more complex or require more judicial resources to adjudicate or are more salient in the case as a whole than the federal law claims." *Dedalus Found. v. Banach*, No. 09 Civ. 2842 (LAP), 2009 WL 3398595, at *5 (S.D.N.Y. Oct. 16, 2009) (internal quotation marks omitted); *see also Patel v. Baluchi's Indian Rest.*, No. 08 Civ. 9985 (RJS), 2009 WL 2358620, at *5 (S.D.N.Y. July 30, 2009) ("[A] state claim substantially predominates if the state claim constitutes the real body of a case, to which the federal claim is only an appendage and litigation of all claims in the district court can accurately be described as allowing a federal tail to wag what is in substance a state dog." (internal quotation marks omitted)).

"When similar evidence and witnesses will be required to adjudicate state and federal claims, principles of judicial economy dictate that trying the state law claims in state court and the FLSA claim in federal court would require duplication of efforts and would be a waste of judicial resources." *Chaluisan*, 698 F. Supp. 2d at 403 (internal quotation marks and ellipses omitted).  Here, on the contrary, the evidence underlying the wage and hour claims shares only a small degree of overlap with the sexual harassment, disability discrimination, and tort claims.[6]

---

[6] As a further demonstration of the predominance of the non-wage claims, the Court notes that over 100 paragraphs of the complaint are spent on the sexual harassment and disability discrimination allegations (FAC ¶¶ 21-129), while the wage and hour allegations take up only about 30 paragraphs (*id.* ¶¶ 130-61).

Moreover, as set out above, the evidence supporting the wage and hour claims is limited, and these claims may also be uncontested.  Plaintiffs' attempt to litigate largely unrelated nonfederal claims in the same action—which appear likely to require significantly more discovery—would result in the engrafting of a distinct, more complicated litigation onto a straightforward wage and hour case.  This course of action would not promote the values of judicial economy and convenience.  *See Dedalus Found.*, 2009 WL 3398595, at *5 (declining to exercise supplemental jurisdiction where the federal claim was described as "an appendage" to the state law claims, which "form[ed] the real body of the case" (internal quotation marks omitted)).

Finally, as concerns fairness to litigants: the parties have long been aware of the potentially problematic nature of the exercise of supplemental jurisdiction in this case.  This Court inquired as to the existence of supplemental jurisdiction in October 2014, before the resolution of the motions to dismiss.  (*See* Dkt. No. 29, at 6.)  Moreover, the parties were aware of the availability of a state forum for their nonfederal claims—in fact, Plaintiff Thomas first filed the same claims in state court before dismissing that case in favor of this one.  (*See* Pl. Br. at 3-4.)  Indeed, Defendants initially moved to dismiss or to stay the instant action in favor of the state court action.  (*See* Dkt. No. 8.)  The Court concludes that declining to exercise supplemental jurisdiction would not be unfair to the litigants.

Therefore, the Court alternatively declines to exercise supplemental jurisdiction over the non-wage claims, which would substantially predominate over the FLSA claim.

## III.     Conclusion

For the foregoing reasons, Plaintiff's motion to exercise supplemental jurisdiction is GRANTED IN PART and DENIED IN PART.  The Court concludes that the exercise supplemental jurisdiction is proper over the nonfederal wage and hour claims—that is, the

second, third, and fourth claims in the First Amended Complaint.  The fifth, sixth, seventh,

eighth, ninth, and tenth claims in the First Amended Complaint are DISMISSED without

prejudice for lack of subject matter jurisdiction.  In the alternative, the Court declines to exercise

subject matter jurisdiction over those claims.

The Clerk of the Court is directed to close the motion at docket number 55.

SO ORDERED.

Dated: April 21, 2015
       New York, New York

_____
        J. PAUL OETKEN
     United States District Judge